UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 06-53-P-H |
| | ) | |
| STEVEN G. BRAME, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Steven G. Brame is charged with possession of five grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 844(a); possession of a firearm during and in relation to the first offense charged in violation of 18 U.S.C. § 924(c)(1) and (2); possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and possession of a firearm with an obliterated manufacturer's serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(2), all on May 6, 2006. Indictment (Docket No. 1) at 1-2. He brings four motions to suppress: one to suppress his arrest (Docket No. 19), one to suppress unspecified physical evidence (Docket No. 20), one to suppress statements (Docket No. 21) and one to "suppress" his stop by Portland police officers (Docket No. 22). An evidentiary hearing was held before me on October 6, 2006 at which the defendant appeared with counsel. I now recommend that the following findings of fact be adopted and that the motions be denied.

### I. Proposed Findings of Fact

The only witness at the evidentiary hearing was Martin Ney, a Portland police officer with seven years experience as a patrolman. No exhibits were offered.

On the night of May 6, 2006 Ney was on patrol alone in a van containing a mobile intoxilyzer. At about 9:00 p.m. he received a radio call directing him to the McDonald's on St. John Street. He was told that an employee of the McDonald's had reported witnessing a drug transaction in the McDonald's bathroom. The participants were reported to be a white male with a handlebar mustache and a new jean jacket and a black man wearing baggy jeans and a blue T-shirt. As Ney drove into the McDonald's parking lot Officer Patrick Connolly also arrived in his marked police cruiser.

The officers went into the McDonald's through the door on the right as one faces the street side of the building. As they were going in they saw a black male wearing baggy jeans and a blue T-shirt leaving through the door on the left side of the building. The officers went to the counter, waited briefly and then spoke with the shift manager, who had made the initial call to the police dispatcher. The manager told them that when he went into the bathroom he saw two males in front of the urinals exchanging cash and a plastic baggie. His description of the men was consistent with the description the dispatcher had conveyed to Ney. He told the officers that the white male got into a maroon SUV and drove away. He said that the black male stayed in the building and ordered a sandwich. The manager had called the police immediately after he left the bathroom. The white male has not been apprehended; no one involved knew who he was.

The manager's description of the black male fit the black male the officers saw leaving as they arrived, so they decided to go out the exit that man had used and see whether they could find him. There is an Amato's shop next to that side of the McDonald's, less than 50 feet away. The area is a well-lit plaza and the street lights were on. As they were walking out the door, the officers saw the black male enter the Amato's. They walked over to a breezeway at the Amato's and saw the black

male purchasing cigarettes. They decided to wait outside until he left the shop because there were other patrons inside.[1]

When the black male came out of Amato's the officers confronted him on or near the steps coming down to the right of a concrete platform in front of the entrance to the shop (as one faces the shop). Ney identified the defendant as the black male. The officers asked the defendant if they could speak with him, identified themselves as police officers, and told him that they were stopping him due to a report they had received of a drug transaction inside the McDonald's. The defendant was very nervous and fidgety. He immediately acknowledged that he had been in the McDonald's bathroom. He said that he was in the bathroom with his boss and either was getting paid for some work he had done or was paying for some work that had been done. He did not answer when Ney asked what type of work had been involved.

Connolly asked the defendant for some identification. As the defendant was pulling a wallet out of his pocket Connolly saw a pocket knife and grabbed it for the officers' safety. The defendant fumbled through his wallet, all the while looking around and never making eye contact with the officers. At some point during the conversation, the officers, worried based on their training that the defendant might be looking for an escape route, got closer to him and moved him in toward the wall of Amato's; at this time they were about three feet from the defendant. In order to prevent any attempt to run, Ney asked the defendant to sit down on the stairs while he looked through his wallet. The defendant produced a Maine identification card identifying him as Steven Brame. The officers again explained why there were there and Ney then asked whether the defendant had any drugs, weapons, needles or other contraband on his person. The defendant said that he did not.

---

[1] On cross-examination, Ney agreed that his report of the incident, which he wrote later that night, could be read to say that the officers waited for the black male inside Amato's and escorted him outside.

The defendant put his hands in the large pockets of his pants several times throughout the conversation and the officers repeatedly asked him to remove his hands from his pockets for their own safety. Ney was concerned that there might be drugs or weapons in the defendant's pockets. He testified that, "Usually for a drug transaction, weapons might be involved." At some point the defendant stood up. The officers asked again if he had any contraband because his hands kept going back into his pockets. Ney asked the defendant, "Do you mind turning your pockets inside out?" The defendant turned out only the corners of his pockets and did not empty them. When the defendant stood up, Ney saw one pocket swaying in a manner that indicated that there was an object in the pocket.

The defendant yelled to a patron entering Amato's that the police were harassing him because he was black. He asked the officers why they were giving him trouble and harassing him. He was still looking around and not making eye contact with the officers. The officers told him to turn around and put his hands behind his back. The defendant would not comply with this request and became somewhat aggressive. Ney grabbed one of the defendant's arms and Connolly grabbed the other. They pushed him up against the brick wall of Amato's and handcuffed him. The defendant then looked at Ney and said, "It's in my pocket." Ney looked down and could see the butt end of a handgun in the defendant's pocket. He removed a .45 caliber Intertech semi-automatic handgun from the defendant's pocket. At about this time Officer Jeff Viola arrived in response to Ney's call for backup. Viola took his place beside the defendant while Ney examined the handgun, which was loaded but had no bullet in the chamber. Ney unloaded the gun.

Connolly found some marijuana on the defendant. Sergeant Martin, a police supervisor, arrived in response to the call for backup and either he or one of the officers lifted the defendant's shirt, whereupon Ney saw a plastic baggie inside the waistband of the defendant's boxers. Ney removed the baggie, which contained crack cocaine. The defendant was placed in Viola's cruiser.

Ney did not mention the swaying pocket in his report or in his testimony to the grand jury. At no time did Ney advise the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), nor was he present when anyone else so advised the defendant. At no time did Ney tell the defendant that he was under arrest, although he believes that the defendant assumed that he was under arrest when he was handcuffed.

## II. Discussion

### A. The Stop

The government takes the position that, until the handgun was found in the defendant's pocket, the incident remained an investigatory stop. The defendant takes the position that the officers' stop of him was made without reasonable and articulable suspicion, as required by *Terry v. Ohio*, 392 U.S. 1 (1968). Defense Motion to Suppress Stop, etc. (Docket No. 22). A police officer may initiate an investigatory detention of a person if the officer has a reasonable and articulable suspicion that the person is engaged in criminal activity. *Id*. at 21. The Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). This standard requires something less than probable cause. *Id*. Once the detention has begun, police officers are entitled to engage in investigative activity reasonably related to the circumstances that justified the initial stop. *United States v. Sharpe*, 470 U.S. 675, 682-83 (1985).

Here, Ney and Connolly clearly had a reasonable and articulable suspicion that the defendant had engaged in criminal activity in the McDonald's bathroom shortly before they stopped him in or just outside the store next door to the McDonald's. He fit the description of one of the participants in the drug transaction given by the McDonald's employee who reported witnessing the transaction — a black male wearing a blue T-shirt and baggy jeans. The officers saw him leaving the McDonald's and

5

were told by the McDonald's shift manager that the black man seen in the bathroom had come out of the bathroom, ordered a sandwich and stayed to eat it before leaving. This was sufficient information to give Ney and Connolly the necessary suspicion to justify the stop under *Terry*. *See generally United States v. Romain*, 393 F.3d 63, 71-74 (1st Cir. 2004) (reasonable suspicion may be based on information furnished by others; deference due to experienced perceptions of officers). The motion to suppress the stop should be denied.

### B. The Arrest

The defendant contends that he was arrested without probable cause. Defense Motion to Suppress Arrest, etc. (Docket No. 19). He asserts that "there was no reason to believe that a crime had been committed and that the Defendant committed said crime." *Id*. The government contends that the arrest occurred only after the drugs and guns were taken from the defendant's person, but it argues that there was probable cause for the arrest whether it occurred then or earlier during the relevant events. Government's Consolidated Objection to Defendant's Pretrial Motions, etc. ("Opposition") (Docket No. 24) at 7-8.

"[O]fficers who stop a person who is 'reasonably suspected of carrying drugs' are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions,' and to take reasonable measures to protect themselves." *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (citation omitted). Even the placing of handcuffs on the person stopped does not necessarily convert the stop into an arrest. *United States v. Fornia-Castillo*, 408 F.3d 52, 64-65 (1st Cir. 2005); *but see United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("[A] reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police — in other words, that he was restrained to a degree normally associated with

6

formal arrest and, therefore, in custody."). While the defendant was not free to leave after Ney and Connolly detained him, that fact alone does not convert the stop into an arrest. *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (no arrest where police boxed in defendant's vehicle and approached it with dog and hands on guns).

In this case, counsel for the defendant emphasized in his oral argument Ney's testimony that the defendant "probably assumed it [that he was under arrest] when [I] handcuffed him." Assuming *arguendo* that the defendant was arrested at this point, *but see Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004) (detention may amount to arrest when police actions taken during detention exceed what is necessary to dispel the suspicion that justified stop), the officers had already taken a pocket knife from him; knew that the defendant had admitted being in the bathroom at McDonald's and exchanging cash with another man while there; knew that the McDonald's shift manager had said that he saw a baggie and cash being exchanged by the men in the bathroom; knew that the defendant matched the description of one of the men given by the shift manager; had observed the defendant failing to make eye contact, appearing nervous and fidgety, appearing to be looking for an avenue of escape, failing to comply with a request to empty his pockets, failing to comply with a request to turn around and put his hands behind his back, failing to answer a question about the nature of the work for which the defendant said he was paying or being paid in the bathroom, and repeatedly putting his hands in his pockets after being asked not to do so; and had observed one of the defendant's pockets swaying as he stood up, demonstrating the presence of a weighty object in the pocket. This was sufficient information to give the officers probable cause to arrest the defendant.

Probable cause to arrest exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed a crime. *United States v. Vongkaysone*, 434 F.3d 68, 73 (1st Cir. 2006). An

inquiry into probable cause focuses on what the arresting officer knew at the time of the arrest, *id.*, and should evaluate the totality of the circumstances, *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005). As set forth immediately above, in this case Ney and Connolly relied on information from the McDonald's shift manager, which they had no objective reason to doubt, and on their own observations in deciding to arrest the defendant, if that was what they did when they put the defendant in handcuffs. A reasonable and prudent person having that knowledge would believe that the defendant had been involved in an illegal drug transaction. Because there was probable cause to arrest the defendant at the time he was handcuffed, there is no need to consider whether he was actually not arrested until some later time.

The arrest of the defendant could not have occurred before he was placed in handcuffs. Under the case law set forth above, only a *Terry* stop took place before that event.

The motion to suppress the arrest should be denied.

### C.  The Physical Evidence

A knife, a gun, marijuana and crack cocaine were seized from the defendant after he was stopped by the officers. The government takes the position that these items were seized before the defendant was arrested. Opposition at 7 n.1. It contends that the drugs and gun were seized during a frisk that was incident to the *Terry* stop. *Id.* at 6. The defendant takes the position that the items were seized after he was arrested, that no probable cause existed to arrest him and that therefore the search cannot be justified as incident to a lawful arrest. Defense Motion to Suppress Physical Evidence, etc. (Docket No. 20). In the alternative, the defendant contends that the seizure cannot be justified as related to officer safety because there was no reason to believe that he was "armed and dangerous." *Id.*

My conclusion that no arrest occurred before the defendant was placed in handcuffs means that the seizure of the defendant's pocket knife need be justified only under the "frisk" portion of the *Terry* stop-and-frisk standard. After a valid *Terry* stop, like the one here, a pat-frisk for weapons is permissible where the police officer is justified in believing that the person is armed and dangerous to the officer or others. *United States v. Aitoro*, 446 F.3d 246, 252 (1st Cir. 2006). Here, Connolly saw the pocket knife when the defendant pulled his wallet out of his pocket in order to show the officers some identification. This manner of seizure is even less intrusive than a patdown which would be permissible under *Aitoro* in the circumstances present in this case.

Assuming *arguendo* that the defendant was arrested when he was placed in handcuffs, I have concluded that there was probable cause for the arrest. Accordingly, the standard applicable to the seizure of the drugs and the gun, which took place after the handcuffs were applied, is that of a search incident to arrest. A search incident to arrest is justified "by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime." *Sibron v. New York*, 392 U.S. 40, 67 (1968) (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)). The seizure of the gun and drugs from the defendant, as described by Ney, was reasonably limited in scope to these purposes. Of course, if the arrest occurred some time after these items were seized, the *Aitoro* standard applies to the seizure. Ney and Connolly were justified in believing that the defendant was armed and dangerous to them, given the defendant's demeanor and failure to comply with the officers' requests, the fact that a drug transaction was involved and the fact that a knife was seen when the defendant took out his wallet.

The motion to suppress physical evidence should be denied.

### D.  The Statements

The defendant seeks suppression of "any evidence gathered as a result of the custodial interrogation of the Defendant by law enforcement officers on May 6, 2006." Defense Motion to Suppress Statements, etc. (Docket No. 21). No *Miranda* warnings were given to the defendant, but none were necessary before a reasonable person in his position would believe he was "in custody" under the circumstances. *United States v. Pagán-Santini*, 451 F.3d 258, 263 (1st Cir. 2006); *see also United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005). Ney's testimony did not include any statements made by the defendant after he was handcuffed, so there is no need to consider the lack of warnings after that event. With respect to the statements made by the defendant before he was handcuffed, *Teemer* also applies.

The First Circuit's reasoning in *Teemer* strongly suggests the appropriate outcome for the instant motion.

> Although any restriction on movement might as a literal matter be labeled "custodial," the Supreme Court has flatly rejected such an approach, holding that someone questioned at a routine traffic stop in a non-coercive setting need not be given the *Miranda* warning. In fact, *Terry* stops, which may be made on reasonable suspicion rather than probable cause, tend not to be treated as custodial unless they become unduly prolonged or especially restrictive.
>
> In the present case, both the circumstances and the officers' testimony suggest that Teemer, although not told to remain, would not have been allowed to leave the scene once suspicion began to envelop him. But he was not handcuffed, placed in the police car, or subject to direct physical constraint beyond being asked not to approach or to communicate with [the driver of the car in which he had been a passenger] after the latter's arrest. Teemer . . . stood around in the vicinity of the officers, but not under close guard or direct restraint.
>
> The entire sequence, from car stop to Teemer's arrest, took slightly over 30 minutes. This is longer than most traffic stops, but well within the period in which *Terry* stops have been treated as valid and not *de facto* arrests. Nor was Teemer subject to systematic interrogation: he was asked a

>number of questions at different times on different subjects (license, probation, the weapon) as the police continued to assess his status.
>
>We agree with Teemer's claim that a reasonable person in his position would not have thought himself free to walk away; and, certainly, once the weapon was discovered, something more than a routine traffic stop was in progress. But on the broad spectrum from a speeding ticket to a grilling in the squad room, the events here were in the *Terry* stop range and short of any *de facto* arrest or custodial interrogation; given this, and that the circumstances were not inherently coercive, no *Miranda* warning was required.

*Id*. (citations omitted). The facts in the case at hand are similar. The defendant was not free to walk away once Ney and Connolly approached him, but when he made the statements that must be the subject of this motion he was not physically restrained. Before the defendant was handcuffed, the events described by Ney were also "in the *Terry* stop range and short of . . . custodial interrogation." The stop was neither unduly prolonged nor especially restrictive. Nor were the circumstances more "inherently coercive" than those in *Teemer*.

Accordingly, on the record before the court, the defendant's motion to suppress his statements to Ney and Connolly should be denied.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and the defendant's four motions to suppress (Docket Nos. 19-22) be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 12th day of October, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge